OPINION
{¶ 1} Robert Goldwire appeals from his conviction of rape, aggravated burglary, and an accompanying firearm specification.
 {¶ 2} Goldwire's convictions resulted from his relationship with T.B., the victim in this matter. Goldwire and T.B. had an ongoing romantic relationship for two and one-half years ending in July 2001. T.B. was pregnant with Goldwire's child when she had a miscarriage in July 2001. She ended the relationship because she thought Goldwire wasn't being supportive, wasn't paying the bills, was mentally abusive, and was cheating on her with her cousin Latwanda Riley. (Tr. 23).
 {¶ 3} T.B. testified that she became employed as a licensed practical nurse at Kettering Hospital in May 2001 to support herself and her son. T.B. testified that Goldwire came to her apartment in the early afternoon on February 26, 2001. Since she had worked the night before, T.B. was dressed in a pajama top. She testified that she opened the door for Goldwire to see him standing there pointing a gun with a laser pointer at her.
 {¶ 4} T.B. testified that Goldwire proceeded to rape her at gunpoint. She said he said "I couldn't get him used to this pussy for almost three years and then just take it away from him." (Tr. 34). She testified she did not put up resistance because she was scared Goldwire would shoot her. (Tr. 37). She testified she thought Goldwire ejaculated inside her. She said she proceeded to the bathroom to clean up when Goldwire told her to get in the shower with him. (Tr. 42). After the shower, she said Goldwire continued to point the gun at her.
 {¶ 5} T.B. then testified she drove Goldwire to a Kelley temporary worker agency to pick up his paycheck. She said she didn't attempt to run away from Goldwire because he had the gun and he knew where she lived. (Tr. 52). T.B. testified she drove Goldwire home and then went to her best friend, Dionne's home. She told Dionne that Goldwire had threatened her with a gun and that he would kill any man he saw her with. (Tr. 66).
 {¶ 6} On cross-examination she testified she didn't tell Dionne that Goldwire had raped her because she was ashamed. (Tr. 66-67). She testified Dionne told her to call the police, which she did after leaving Dionne. T.B. said two police officers responded and she told them Goldwire had assaulted her with a gun, she again did not report the rape. She was instructed to report to the detective section the next day which she did. She was asked by the detectives if she was raped at gunpoint and she responded she had been (Tr. 71). She testified that another reason she didn't initially report the rape was because she didn't think anyone would believe her because she had consensual sex with Goldwire the month before he raped her. (Tr. 72). On cross-examination, T.B. said that after the rape, Goldwire noticed her crying and said "You really didn't want that, did you? (Tr. 92).
 {¶ 7} "COUNSEL: Q. Like he didn't know?
 {¶ 8} "[T.B.]: A. Yes."
 {¶ 9} Sergeant Thomas Lawson of the Dayton Police Department testified he interviewed T.B. and then proceeded to secure an arrest warrant for Goldwire. He testified he went to Latwanda Riley's apartment and secured a consent to search the apartment from her to look for Goldwire. Lawson said Goldwire was discovered in a bathroom and a .38 caliber semiautomatic with a laser site was recovered in a black fanny pouch under a bed mattress. The gun was loaded with ten rounds of ammunition. (Tr. 141). Chris Monturo of the Miami Valley Regional Crime Laboratory testified he test fired the weapon and found it operable.
 {¶ 10} In his first assignment of error, Goldwire contends his convictions are against the manifest weight of the evidence presented the jury. Goldwire argues the evidence failed to establish that he had a specific intent to rape T.B. . He notes the evidence established that he and T.B. had a continuing consensual sexual relationship up until a month before the alleged rape. He argues the evidence established that he was unaware that T.B. didn't want to engage in sex with him. Likewise, he argues his aggravated burglary conviction was against the manifest weight of the evidence because the evidence demonstrated that he had no intention of raping T.B. upon entering her apartment.
 {¶ 11} A reviewing court, when evaluating the merits of a manifest-weight-of-the evidence argument, must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine
 {¶ 12} "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 13} Although a weight-of-the-evidence argument permits a reviewing court to consider the credibility of witnesses, that review must nevertheless be tempered by the principle that weight and credibility questions are primarily for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. In Statev. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, this Court reasoned that
 {¶ 14} "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."
 {¶ 15} The State's entire case was the testimony of T.B. There was no medical or forensic evidence to corroborate her testimony. The only corroborative evidence was the defendant's possession of the gun with the laser pointer. T.B. did not report the alleged rape to her best friend initially and waited to tell the police about the rape only after being prodded to do so by the investigating detective a few days after the rape.
 {¶ 16} The defendant did not testify so the jury was left with deciding whether T.B.'s testimony was credible beyond a reasonable doubt. The jury was in the best
 {¶ 17} position to evaluate her testimony, and there was nothing incredible about her testimony. The first assignment of error must be overruled.
 {¶ 18} In his second assignment, Goldwire argues that his trial counsel was constitutionally ineffective because he failed to subpoena phone records which would have indicated he had spoken to T.B. the day before the alleged rape. He also argues that his counsel was ineffective for not presenting DNA evidence that he had not penetrated or ejaculated inside T.B. as she testified.
 {¶ 19} The State argues and we agree that there is no evidence in the trial record that such phone records actually existed, and there is no evidence that DNA evidence from the defendant would have been useful since T.B. immediately showered and didn't report the crime until a few days after the rape.
 {¶ 20} Goldwire argues that his trial counsel was ineffective for not cross-examining T.B. concerning her accusations in an unrelated criminal case that he had pepper-sprayed her. Goldwire argues that counsel should have gotten T.B. to admit that the jury acquitted him of her accusation. Such an inquiry, however, would have been improper, because it would have demonstrated only that the jury was unable to find the defendant guilty of the charge beyond a reasonable doubt. It would have been relevant to inquire of T.B. if she had admitted to anyone that she lied about the pepper-spraying accusation, assuming there was evidence of such lying available to defendant's counsel.
 {¶ 21} Goldwire argues that his counsel was ineffective for not allowing him to testify despite his request to do so. Goldwire says he would have testified that he had a key to the victim's house. (Tr. 253). There is no evidence in the trial record that Goldwire wished to testify over his counsel's objections.
 {¶ 22} Lastly, Goldwire argues that his trial counsel was ineffective for not offering in evidence a letter from his employer that Goldwire and T.B. appeared in good spirits when Goldwire picked up his paycheck. Also he argues that his trial counsel was ineffective for not calling Rodney Moree who would have testified that Goldwire was at his home at 2:45 p.m. on the day in question and thus had an "alibi" to the charges leveled by T.B.
 {¶ 23} Again Goldwire asks us to consider matter that is not part of the trial record and thus we cannot consider it in this appeal. Goldwire may wish to submit this evidence in aid of a post-conviction petition but it is improper in this appeal. The appellant's second assignment of error is overruled.
 {¶ 24} In his third assignment, Goldwire argues that the trial court committed "plain error" in allowing two highly prejudicial statements to remain as part of the trial record.
 {¶ 25} T.B. was asked by the prosecutor when did she learn Goldwire was cheating on her. She replied that Latwanda came to her apartment crying and asking if Robert (Goldwire) was there with her. T.B. replied, "And Robert had gone somewhere. So I invited her in. And she told me about a crime that Robert had committed." Defense counsel objected and the court sustained the objection. The second objectionable testimony occurred when the prosecutor asked T.B. when she reported her gun missing and she replied, "I don't know. When he pepper-sprayed me, the day we broke up, and when I was — when he pepper sprayed me. I couldn't. . . ." Defense counsel objected and the court sustained the objection as unresponsive. Goldwire argues that the trial court committed prejudicial error in not sua sponte ordering the objectionable testimony stricken from the trial record.
 {¶ 26} The State argues that defense counsel may not have moved to strike the objectionable testimony to prevent emphasizing the information inadvertently elicited. The trial court may have similarly been concerned that mentioning the objectionable testimony again might only give undue emphasis. In any event, we cannot say that the court's inaction amounted to "plain error." In short, we cannot say the results of the trial would have been clearly different had the court struck the objectionable testimony and given the jury an admonishing instruction. See, State v.Long (1978), 53 Ohio St.2d 91. The third assignment of error is overruled.
 {¶ 27} Finally, Goldwire contends the trial court erred in not instructing the jury it could consider the lesser included charge of aggravated trespassing to the aggravated burglary charge in the indictment.
 {¶ 28} Pursuant to R.C. 2945.74 and Crim.R. 31(C) when supported by the evidence at trial, the jury must be instructed on lesser included offenses. State v. Deem (1988), 40 Ohio St.3d 205, paragraph one of the syllabus. R.C. 2945.74 provides, in pertinent part:
 {¶ 29} "When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense."
 {¶ 30} The Supreme Court of Ohio has adopted a two-prong test to determine whether a jury instruction on a lesser included offense is necessary. First, the trial court must determine whether the offense on which the instruction is requested is a lesser included offense of the crime charged. State v. Kidder (1987), 32 Ohio St.3d 279, 280-281; Statev. Coulter (1992), 75 Ohio App.3d 219, 225. Secondly, the court must determine whether the evidence supports an instruction on the lesser included offenses. Kidder, 32 Ohio St.3d at 281.
 {¶ 31} The Supreme Court of Ohio in Deem, 40 Ohio St.3d at paragraph three of the syllabus, set forth a three-part test to determine whether an offense is a lesser included offense of another offense. The Court in Deem, supra, held that:
 {¶ 32} "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. (citation omitted)." See, also, Statev. Wilkins (1980), 64 Ohio St.2d 382, 384.
 {¶ 33} In the present case, Goldwire was convicted of aggravated burglary. R.C. 2911.11, the aggravated burglary statute, provides in pertinent part:
 {¶ 34} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 {¶ 35} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 {¶ 36} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."
 {¶ 37} R.C. 2911.211, the aggravated trespass statute, provides in pertinent part:
 {¶ 38} "(A) No person shall enter or remain on the land or premises of another with purpose to commit on that land or those premises a misdemeanor, the elements of which involve causing physical harm to another person or causing another person to believe that the offender will cause physical harm to him."
 {¶ 39} The State argues that one can commit aggravated burglary in violation of R.C. 2911.11(A)(2) without committing aggravated trespass because R.C. 2911.11(A)(2), for which Goldwire was charged, does not require that the offender have purpose to cause physical harm or cause his victim to believe he will cause physical harm but need only trespass with purpose to commit any criminal offense and be in possession of a deadly weapon. We agree. Here aggravated trespass is not a lesser included offense of aggravated burglary as defined at R.C. 2911.11(A)(2) and the court properly denied the requested instruction.
 {¶ 40} The appellant's fourth assignment of error is also overruled. The judgment of the trial court is Affirmed.
FAIN, P.J., and WOLFF, J., concur.